UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| DR. IQBAL HUSSAIN BSc MBBS FRCS MSc(urol), <br><br> *Plaintiff,* <br><br> v. <br><br> ASTRAZENECA PHARMACEUTICALS LP <br><br> *Defendants.* | C.A. No: _____ <br><br> (Jury Trial Demanded) |

**COMPLAINT**

Plaintiff Dr. Iqbal Hussain ("Plaintiff"), brings this action against Defendant AstraZeneca Pharmaceuticals LP ("Defendant"), alleging discrimination based on national origin, retaliation for exercising rights guaranteed by the Family and Medical Leave Act, and wrongful termination in violation of public policy under Maryland common law. Plaintiff seeks relief for the damage suffered as a result of Defendant's unlawful actions.

**INTRODUCTION**

1. This is an action for unlawful discrimination, retaliation, and wrongful termination brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and wrongful termination in violation of public policy under Maryland common law.

1

2. Plaintiff, a British national, was subjected to a pattern of discrimination, harassment, retaliation, and wrongful termination by Defendant and its employees, particularly his first line manager Sushant Hardikar, his second line manager Jessica Gilly, and other senior executives due to his national origin, taking protected FMLA leave, and failing to execute actions that would violate public policy. The Defendant's harassment, retaliation, and illegal acts culminated in Plaintiff's termination.

## PARTIES AND JURISDICTION

3. Plaintiff is a medical doctor and a dual citizen of the United Kingdom and the United States, who resides in Baltimore, Maryland. He is a urologist, a fellow of the Royal College of Surgeons of England, with over 20 years' experience in the pharmaceutical industry working in clinical development and medical affairs in UK and USA.

4. Defendant is a Delaware limited partnership with its principal place of business located at 1 Medimmune Way, Gaithersburg, Maryland, 20878. Defendant is a global biopharmaceutical company that develops and commercializes prescription medicines, primarily for the treatment of diseases in several core therapy areas, including oncology.

5. At all times relevant to this Complaint, Plaintiff was an employee of Defendant at Defendant's Gaithersburg, Maryland office.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 1343, and 1367, and 42 U.S.C. § 2000e et seq., specifically Title VII, and the FMLA.

7. Venue is proper in this District where Plaintiff resides therein, and the acts complained of occurred pursuant to 28 U.S.C. § 1391(b).

## FACTS

8. Defendant is a pharmaceutical company engaged in the business of developing and marketing prescription drugs for treating urological cancers and other therapeutic areas.

9. Defendant is subject to extensive regulation by the US Food & Drug Administration and the Office of the Inspector General, US Department of Health and Human Services, and other state and federal laws and guidelines.

10. At all times herein relevant, it was, and remains, the clearly mandated public policy of the State of Maryland and the United States to promote and preserve the health, safety, and welfare of citizens and their access to appropriate medical care by requiring pharmaceutical companies to comply with all applicable laws, regulations and ethical standards. Said policy is enunciated in applicable state and federal law, including MD Code, Health - General, § 2-501 et seq.; The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. 301 et seq.; The Anti-Kickback Statute, 42 U.S.C. § 1320a-7; the Compliance Program Guidance for Pharmaceutical Manufacturers of the Office of the Inspector General - US Department of Health and Human Services ("OIG"); the "Code of Interactions with Healthcare Professionals" of the Pharmaceutical Research and Manufacturers of America ("PhRMA") relating to the marketing of pharmaceutical products; and the "Standards to Ensure Independence in CME Activities" of the Accredited Council for Continuing Medical Education ("ACCME").

11. At all times herein relevant, Defendant was subject to federal laws and regulations that prohibit it from paying substantial incentives to physicians, either directly or indirectly through payments via third parties and vendors, to induce them to prescribe, recommend, or promote a prescription or unapproved drug for the purpose of generating sales.

12. On June 10, 2021, Defendant initiated recruitment of Plaintiff due to Plaintiff's extensive experience and expertise in medical affairs and urology, his knowledge of treating and managing bladder and prostate cancer patients as a urologist, and his expertise in medical affairs and the pharmaceutical industry.

13. On June 23, 2021, Dr. Carolina Zingoni interviewed Plaintiff on behalf of Defendant.

14. On June 28, 2021, Dr. Luca Dezani interviewed Plaintiff on behalf of Defendant, subsequently informing him of his rising candidacy.

15. On June 29, 2021, Tania Murray from Defendant's HR talent acquisition team began sending Plaintiff application forms and benefits package information, including a $75,000 signing bonus.

16. During the interview process, Plaintiff understood he was a candidate for the position of Medical Head for US Medical Affairs in Urology (responsible for bladder cancer and prostate cancer).

17. To Plaintiff's surprise, upon acceptance of Defendant's offer, he was given the position of Medical Lead for Bladder Cancer only and was mandated to report to Sushant Hardikar, a relatively new hire to Defendant, who was not a physician.

18. On August 23, 2021, Plaintiff began his employment with Defendant at its office in Gaithersburg, Maryland. His total compensation package was over $500,000, including benefits and performance-based incentives.

19. Notably, Plaintiff never received his $75,000 signing bonus, as verbally promised in HR. Other new hires, including Dr. Christelle Chacar ("Dr. Chacar"), received a signing bonus.

4

20. At the time of his hire and at all times herein relevant, Plaintiff was knowledgeable about the laws, regulations and ethical standards that govern the marketing of prescription drugs by pharmaceutical companies, as well as ethical interactions with prescribing physicians vendors and other stakeholders.

21. While making small talk during the initial period of employment, Sushant Hardikar ("Mr. Hardikar"), Plaintiff's supervisor, explained to Plaintiff that he was Hindu educated in a conservative, disciplined, British school in India which caused him to form a profound dislike for the British. Plaintiff provided no reply.

22. As Plaintiff began to settle into his role, he referred Dr. Chacar to Defendant, for a position on his staff.

23. Inevitably, Dr. Chacar was hired and named Medical Director in US Medical Affairs for bladder cancer.

24. Despite Defendant's policy which provides referral bonuses, Plaintiff was never given a bonus for the referral of Dr. Chacar.

25. As Dr. Chacar began her new position with Defendant, Mr. Hardikar instructed her not to take direction from Plaintiff, but to instead focus on prostate cancer, leaving Plaintiff without sufficient staffing.

26. Despite insufficient staffing, in March of 2022, Plaintiff received a pro-rated performance bonus equaling forty percent (40%) of his annual salary, a raise in his annual salary, and a cash bonus above the twenty percent (20%) targeted for his position, in recognition of his high performance.

27. Despite his bonuses, in the months to come, Mr. Hardikar continued to make snide remarks in the presence of Plaintiff, even occasionally expressing his disdain and hatred for British people since they colonized and ruled over his country of India.

28. Mr. Hardikar soon began to request inappropriate tasks of Plaintiff. Specifically, at one point he emailed Plaintiff to request friendly urologists who he could reward with paid advisory board engagements in exchange for support of AstraZeneca's prostate cancer drug in development. Plaintiff diplomatically rejected these offers from his manager.

29. On May 13, 2022, during a meeting at the American Urological Association (AUA) conference in New Orleans, Louisiana, Mr. Hardikar, openly made discriminatory remarks targeting Plaintiff's British national origin which were witnessed by Dr. Chacar, Laura Cosantino (also an employee of Defendant), and Chief Medical Officer Dr Ravi Tayi.

30. On May 14, 2022, Ms. Cosantino suggested that Plaintiff notify HR regarding Mr. Hardikar's discriminatory remarks, as well as his excessive drinking the night prior. Plaintiff declined to notify HR.

31. Over the remainder of the calendar year, Plaintiff notified Mr. Hardikar about Defendant's actual and suspected compliance violations, only to be told to keep quiet and "do what you're told."

32. In the aftermath of these reported compliance allegations, Mr. Hardikar began to cancel scheduled one on one meetings with Plaintiff for various reasons, most of the time last minute, and rarely offering to reschedule.

33. As this pattern continued, Plaintiff asked Mr. Hardikar about his performance review and was informed that those occurred in the form of yearly bonuses. Plaintiff nevertheless sent his yearly goals and updated them in the company portal as required.

34. In November of 2022, on short notice, Plaintiff and Dr. Chacar were ordered by Mr. Hardikar to organize a Bladder Cancer Advisory Board at the Bladder Cancer Academy Meeting in Houston.

35. Unbeknownst to Plaintiff and Dr. Chacar, Mr. Hardikar had promised funding to doctors to attend prostate cancer advisory boards at that meeting in Houston.

36. When Mr. Hardikar learned this was non-compliant, he terminated the promised funding which frustrated many of the doctors. In an attempt to rectify the situation, Mr. Hardikar ordered Plaintiff to organize a legitimate and compliant Bladder Cancer advisory Board Meeting. Understandably, Plaintiff voiced his displeasures..

37. By December of 2022, Plaintiff's relationship with Mr. Hardikar began to sour, so much so, that Mr. Hardikar didn't cancel his December one-on-one meeting with Plaintiff, and instead utilized the time to scold him on trivial matters related to Plaintiff's work product, then subsequently drafted an email improperly memorizing their discussions, taking Plaintiff by surprise.

38. Understanding that Mr. Hardikar had the power to make his life difficult, Plaintiff attempted to rectify Mr. Hardikar's alleged deficiencies in his work product.

39. Shortly thereafter, during the winter break, Plaintiff's son became critically ill, requiring Plaintiff to quarantine with his son. Despite Plaintiff's proactive communication with Mr. Hardikar about the situation, and his inability to physically report to the office, Mr. Hardikar failed to respond or offer any support.

40. From January 10-13, 2023, Plaintiff attended a crucial franchise meeting in Gaithersburg, Maryland. During that meeting, Mr. Hardikar took measures to minimize Plaintiff's participation, publicly shunning him in front of colleagues through acts of micro-aggression.

41. On January 13, 2023, Plaintiff's son became critically ill and had an emergency hospital admission and was placed on ventilator life support. In total, Plaintiff's son spent three (3) months in hospital.

42. During this very difficult time, Plaintiff, who previously had coronary artery bypass graft surgery, developed chest pains and presented to the hospital himself and underwent studies for his abnormal ECG.

43. Because of these dual events, from January 30, 2023, until April 4, 2023, Plaintiff took protected FMLA leave to care for his critically ill son and recover from his cardiac condition.

44. During his absence, neither Mr. Hardikar nor his manager, Jessica Gilly, offered any sympathy or outreach during the entire period of FMLA.

45. Plaintiff later learned, however, since Mr. Hardikar lived in Plaintiff's neighborhood, that he would often walk past Plaintiff's house during this period of FMLA, so often that it came to the attention of neighborhood security.

46. On April 4, 2023, Plaintiff returned from FMLA leave and was immediately inundated with hostility and unrealistic work expectations from Mr. Hardikar.

47. On April 6, 2023, during their first one on one after his return from FMLA, Mr. Hardikar threatened Plaintiff's employment by falsely claiming that Plaintiff failed to complete assignments during his protected leave.

48. In response, that same week, Plaintiff drafted and sent a detailed 13-page confidential complaint to Defendant's senior most legal counsel and compliance officer, reporting Mr. Hardikar's threats and the early discriminatory comments toward Plaintiff's British national origin.

49. In addition to Mr. Hardikar's behavior, Plaintiff reminded Defendant of his protections under the FMLA and described the numerous occasions during 2022 where he had verbally reported suspected compliance violations.

50. Specifically, Plaintiff complained about having to approve invoices from CLINIGEN, a vendor in the United Kingdom, whom Plaintiff suspected was receiving a "kickback" payment from Defendant. It was Plaintiff's understanding that Mr. Hardikar approved invoices which sought to supply Defendant's cancer medications from the USA to CLINIGEN's warehouse in the UK. From there, the non-FDA approved medication was shipped from CLINIGEN UK to a single patient in California USA. To Plaintiff, a very experienced physician in the world of pharmaceuticals, this arrangement raised significant concerns.

51. On his own accord, and because he was being asked to approve related invoices, Plaintiff carried out an audit which allowed him to conclude that CLINIGEN was being paid excessively for no work.

52. Despite discussing this in his 13-page complaint, Plaintiff received no response from Defendant's senior executives.

53. On April 24, 2023, Mr. Hardikar and Jessica Gilly, set up a meeting with Plaintiff to discuss his alleged poor performance. Plaintiff feared this was a pretext for his eventual termination.

54. On April 26, 2023, Plaintiff met with Joshua Davis and Arlene Davis from Defendant's HR Department to discuss his 13-page complaint and was told that it would be addressed in a forthcoming Compliance Team meeting.

55. On May 23, 2023, having not heard back from HR, Plaintiff requested an update on his complaints, and informed Defendant of continued harassment from Mr. Hardikar and Ms. Gilly.

56. On May 24, 2023, Plaintiff was placed on a 30-day Performance Improvement Plan (PIP) by Defendant.

57. Plaintiff's PIP violated Defendant's own policy, as it was primarily executed through emails, wasn't contained within an official workplace document, and failed to provide clear objectives and goals.

58. Instead, Plaintiff's PIP focused upon matters typically handled by Defendant's Finance Team, as well as other trivial measures such as stock supplies.

59. On July 10, 2023, Plaintiff received an unorthodox written assessment of his PIP, which failed to indicate goals and objectives in the affirmative or negative, and nowhere notified Plaintiff of Defendant's plans post-PIP.

60. Hearing no follow-up, on July 25th, Plaintiff sent another email to Defendant's senior executives, detailing in reverse chronology the conflicts he had endured upon his return from FMLA.

61. Once again, Defendant's senior executives did not reply to the email.

62. On August 16, 2023, Defendant terminated Plaintiff's employment, citing his alleged failure to complete the PIP which had concluded many weeks prior without any indication of failure or impending termination.

63. Defendant's actions have caused Plaintiff significant emotional distress, reputational damage, and financial loss.

64. Plaintiff's complaints about discrimination, retaliation and compliance violations were disregarded by Defendant and Plaintiff was subjected to a hostile work environment, exacerbated by the discriminatory and retaliatory actions of his supervisor and the failure of Defendant's senior executives and management to timely respond to or act appropriately in response to Plaintiff's complaints and requests for support.

65. Plaintiff's engagement in protected activities, including reporting discriminatory and suspected unlawful conduct, and taking FMLA leave, was met with retaliatory actions by Defendant.

66. The adverse employment actions taken against Plaintiff were not justified by his job performance, which was satisfactory prior to the souring of his relationship with Mr. Hardikar, which snowballed into a contentious one on one in December of 2022, and continued during Plaintiff's protected FMLA leave.

67. Plaintiff's termination was a direct result of his national origin, his verbal and written complaints of compliance violations, and his utilization of FMLA leave.

### CLAIMS FOR RELIEF

#### COUNT I
#### Discrimination Based on National Origin - Title VII

68. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

69. Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment on the basis of national origin.

70. Defendant, through its employees, engaged in a pattern of discriminatory conduct against Plaintiff because of his British national origin, which included but was not limited to,

subjecting him to derogatory comments, and treating him less favorably than his non-British counterparts.

71. The discriminatory actions of Defendant, including the wrongful termination of Plaintiff, were intentional, willful, and taken in disregard of his federally protected rights.

72. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered, and continues to suffer, substantial losses in the form of emotional distress, humiliation, embarrassment, stress and anxiety, loss of enjoyment of life, and other non-pecuniary losses, as well as pecuniary losses including but not limited to loss of income, benefits, and other compensation.

73. Plaintiff is entitled to relief, including but not limited to, reinstatement to his position or a comparable position, back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

## COUNT II
### Retaliation in Violation of the Family Medical and Leave Act

74. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

75. At all times relevant to this Complaint, the Defendant was an employer, and the Plaintiff was an employee within the meaning of 29 U.S.C. § 2611.

76. By the conduct alleged herein, Defendant took adverse action against the Plaintiff in retaliation for Plaintiff's exercise of his FMLA rights.

77. Such conduct was in violation of 29 U.S.C. § 2615.

78. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered, and continues to suffer, substantial losses in the form of emotional distress, humiliation, embarrassment, stress and anxiety, loss of enjoyment of life, and other non-pecuniary losses, as

well as pecuniary losses including but not limited to loss of income, benefits, and other compensation.

## COUNT III
## Wrongful Termination in Violation of Public Policy

79. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

80. The public policy of the State of Maryland and the United States promotes and seeks to preserve the health, safety, and welfare of citizens and their access to appropriate medical care by requiring pharmaceutical companies to refrain from paying substantial incentives to physicians, either directly or indirectly through payments via third parties and vendors, to induce them to prescribe, recommend, or promote a prescription or unapproved drug for the purpose of generating sales.

81. Plaintiff made complaints, in good faith, to his manager and to senior executives of Defendant regarding violations of well-established public policy.

82. Defendant retaliated against Plaintiff by terminating him because he raised complaints about Defendant's unlawful practices and thereby terminated the Plaintiff in violation of well-defined public policy.

83. As a direct and proximate result of Defendant's unlawful termination, Plaintiff has suffered damages as set forth herein.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

I. Judgment against the Defendant;

II. Damages, including compensatory, emotional distress, punitive, and/or liquidated, to the Plaintiff, as authorized or mandated by applicable law, in an amount to be determined at trial;

III. Compensation for the Plaintiff of lost wages, benefits and other remuneration with interest thereon;

IV. Costs and any reasonable attorney's fees;

V. Pre-judgment and post-judgment interest;

VI. Appropriate injunctive, declaratory and other equitable relief; and

VII. Such other relief as this Honorable Court may deem just and appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues of fact raised by this Complaint.

Respectfully Submitted,

THE PLAINTIFF,

By: /s/ John A. Butler
John A. Butler, Esquire
Federal Bar No: 21903
DaVida Law, LLC
729 E. Pratt Street, Suite 850
Baltimore, MD 21202
Telephone: (410) 484-2153
Email: jbutler@davidalaw.com
*Attorneys for Plaintiffs*

Michael Turiello, Esq. (30383)
Skeen Law Offices
258 E. High Street
Charlottesville, VA 22902

Telephone: (434) 293-9664
Email: mturiello@skeenlaw.com
*Attorneys for Plaintiff*